# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 06-3790, 06-4006

WAUSAU UNDERWRITERS INSURANCE COMPANY,

*Plaintiff*,

*v.*

UNITED PLASTICS GROUP, INC. and MICROTHERM, INC.,

*Defendants-Appellees*.

THE OHIO CASUALTY INSURANCE COMPANY,

*Intervenor-Appellant*.

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6543—**John W. Darrah**, *Judge*.

_____

ARGUED SEPTEMBER 24, 2007—DECIDED JANUARY 15, 2008

_____

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*.   This diversity suit over insurance coverage arises out of a suit filed in a Texas state court by Microtherm, a manufacturer of water heaters, against United Plastics Group (UPG). The Texas suit complained about a component that UPG had sold Microtherm. Microtherm won that case, obtaining a judgment for

$26.5 million. The Wausau insurance company, UPG's primary liability insurer, brought the present suit in the federal district court in Chicago against UPG for a declaration that its policy doesn't cover the judgment. Wausau settled with UPG, but meanwhile Ohio Casualty, UPG's excess liability insurer, had intervened in Wausau's suit, seeking a similar declaration. After a bench trial—the principal evidence in which, however, was simply the record of the Texas case—the district judge ruled that Ohio Casualty was liable on its excess policy for the damages assessed by the Texas court, up to the $25 million policy limit. Other insurers had reimbursed UPG for a total of $4.8 million, but the judge declined to subtract that amount from the $26.5 million judgment in determining Ohio Casualty's liability to UPG, on the ground that it was unclear whether any part of the $4.8 million related to losses covered by Ohio Casualty's policy. In its present posture, therefore, the case is UPG versus Ohio Casualty, with Ohio Casualty the appellant, having lost in the district court. The substantive issues (all agree) are governed by Illinois law.

In an ordinary hot water heater, a tank full of cold water is heated and the heated water piped to the premises' hot water taps. Microtherm, in contrast, makes a tankless water heater, which it calls the "Seisco." Cold water enters the heater at one end, is heated as it passes through, and comes out the other end as hot water, which is piped to the hot water taps. The main component of the heater is the plastic chamber in which the water is heated. UPG made the chamber out of a plastic manufactured by DuPont called Zytel. DuPont recommended a certain temperature range for molding Zytel. But UPG used a significantly lower temperature

and as a result the water chambers it made and sold to Microtherm were defective and caused many of the water heaters that contained them to fail.

In 2001 Microtherm sold 3,900 water heaters containing chambers manufactured by UPG. Between the start of the next year and the trial in Texas of Microtherm's suit against UPG, 600 of the water chambers ruptured, though only 65 to 75 ruptured while Ohio Casualty's policy, which expired in September 2002, was in force. The ruptures caused the heaters to stop working, generally by shorting the heater's circuit board. In some instances the rupture caused the heater to leak, damaging carpets or other property on the owner's premises. The various mishaps created customer dissatisfaction, leading, Microtherm complained, to a big fall off in its business. The Texas jury issued a special verdict in which it found that UPG had knowingly misrepresented the quality of its heaters by failing to disclose that it had ignored DuPont's recommendations regarding the proper temperature range at which to mold the water chambers. The jury awarded damages equal to the cost to Microtherm of repairing or replacing the water heaters, but that cost came to only $1.1 million; most of the $26.5 million jury award was for lost profits resulting from customers' anger at Microtherm, though there was also a small award ($330,000) of punitive damages.

The insurance policy that Ohio Casualty sold to UPG is a standard Comprehensive General Liability policy and obligates the insurer to indemnify the insured for sums that the insured "becomes legally obligated to pay by reason of liability imposed by law . . . because of . . . 'property damage' . . . caused by an 'occurrence'" during the policy period. "Property damage" is defined

in the policy as "physical injury to tangible property, including all resulting loss of use of that property . . . or . . . loss of use of tangible property that is not physically injured." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not defined, but its meaning is illuminated by the exclusion in the policy of coverage for liability based on harms that are "expected or intended from the stand-point of the insured."

Property was damaged as a result of the defective manufacture of the water chambers. For example, the water chambers themselves were damaged when they ruptured. But damages resulting from physical damage to the insured's own property are expressly excluded from coverage. *Ohio Casualty Ins. Co. v. Bazzi Constuction Co.*, 815 F.2d 1146, 1148-49 (7th Cir. 1987) (Illinois law); *Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.*, 508 F.2d 417, 419-20 (7th Cir. 1975) (same); Jeffrey W. Stempel, *Stempel on Insurance Contracts* § 14.13, p. 213 (3d ed. 2006). The circuit boards, however, were also damaged by some of the ruptures, and they were Microtherm's property rather than UPG's. And sometimes the rupture of the water chamber caused the heater to leak onto and damage the property of the heater's owner, and that was not UPG's property either.

Even the water chambers were not its property after it sold the heaters containing them to Microtherm. But that is not the test of coverage; the test is whether the damaged property was the property of the insured when the defect on which the insured's liability was based came into being. *Travelers Ins. Co. v. Penda Corp.*, 974 F.2d 823, 830-31 (7th Cir. 1992) (Illinois law); Stempel, *supra*, § 14.13, pp. 202, 218-19.

UPG manufactured *only* the water chamber. The rest of the heater was therefore other property; and so we have the following possible causal chains between the manufacturing defect and the business losses that were the main component of the Texas jury's verdict: (1) defect— ruptured water chamber—broken heater because the circuit board shorted—business losses as customers learn about the defective heaters and turn away from Microtherm; (2) defect—ruptured water chamber—broken heater because the circuit board shorted—damage to other property of the owner—business losses when, as before, disgusted customers turn away from Microtherm. In either situation the question is whether "because of property damage" in the Comprehensive General Liability policy makes the insurance company the insurer of those business losses.

As in tort law, e.g., *McPherson v. Schlemmer*, 749 P.2d 51 (Mont. 1988); *Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.*, 773 F.2d 783 (7th Cir. 1985); 1 Dan B. Dobbs, *Law on Remedies* §§ 3.3(4), pp. 302-03; 5.15(1), p. 874 (2d ed. 1993), so in liability-insurance law, once there is damage to property the victim can recover the nonproperty, including business, losses resulting from that damage and not just the diminution in the value of the property. E.g., *Imperial Casualty & Indemnity Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 135-36 (3d Cir. 1988); *American Home Assurance Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 26 (1st Cir. 1986); *Aetna Casualty & Surety Co. v. General Time Corp.*, 704 F.2d 80, 83 (2d Cir 1983); Allan D. Windt, *Insurance Claims and Disputes*, § 11.1, pp. 17-83 (5th ed. 2007); Stempel, *supra*, § 14.04, p. 35. Ohio Casualty argues that Illinois insurance law is different, citing *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481 (Ill. 2001). But the question in that case was not liability for consequential damages;

it was whether physical damage within the meaning of the policy had occurred when a defective plumbing system was installed, or not until later, when the system broke and caused damage; the court held it was the latter.

A much better case for Ohio Casualty is *Viking Construction Management, Inc. v. Liberty Mutual Ins. Co.*, 831 N.E.2d 1 (Ill. App. 2005). Viking contracted to manage the construction of a school for a town. Through the negligence of a subcontractor of Viking's, a wall at the construction site collapsed, causing property damage. The town sued Viking for breach of contract, seeking damages just for the cost of repairing the damage, and Viking sought indemnity from Liberty Mutual. The court held that the damages were not "because of" property damage within the meaning of the General Comprehensive Liability policy. All that the town had sought in its suit against Viking was the cost of replacing the defective wall, which the court equated to a defective product supplied by Viking. The town was not seeking recovery for a loss caused by damage to other property caused by the wall's collapse.

The *Viking* decision, if a sound interpretation of the CGL policy (and we're about to see that it is), scotches any claim that UPG might have to coverage of its liability for the cost to Microtherm of repairing or replacing any of the defective water chambers (or any other business losses resulting from the sale of the defective heaters), as distinct from the cost of repairing the heaters damaged by the defective water chambers (or other business losses resulting from that damage); only the latter cost arose from damage to property other than the defective product itself. This conclusion tracks the "economic loss" rule of tort law, which, with immaterial exceptions, bars the

recovery by means of a tort (including products-liability) suit of business losses when there is no property damage. If the defect that gives rise to liability imposes costs, such as repair costs or loss of customer goodwill, on the purchaser (Microtherm) without physically damaging any of his property, the seller of the product (UPG) is not liable for those costs unless he has agreed by contract to indemnify them. E.g., *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443 (Ill. 1982); *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965) (Traynor, C.J.); *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 308-10 (1927) (Holmes, J.); *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986). (Compare *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217, 1222-24 (5th Cir. 1985), where recovery of such costs was allowed because there was also physical damage to the purchaser's property.)

Otherwise, as Holmes explained in the *Robins* case, the extent of the seller's liability would often depend on his purchaser's contractual relations with third parties, something about which the seller normally would know little. In *Robins* the defendant, a dry dock company, through its negligence damaged a propeller of a boat that the plaintiffs had chartered, and as a result the plaintiffs lost business and sued the dry dock company in tort for the loss. The Court held the suit barred. The relation to the famous rule of *Hadley v. Baxendale* should be plain: in both cases the consequences of delay were far better known to the victim of the delay than to the firm that had caused it. This reason for limiting liability is at least as persuasive as an aid to interpreting the Comprehensive General Liability policy, because the insurer is in a poor position to assess the consequences of a product defect for the business of the product's purchasers. The exception for

the case in which the defect injures other property of the purchasers—the case in which business losses *are* recoverable—does not swallow the rule, though only because such damage is rare.

The *Viking* decision imports the "economic loss" doctrine into the interpretation of the CGL policy, and thus would also bar recovery under the policy if a heater did not work because the water chamber had broken yet the break had not shorted the circuit board or caused physical damage to anything besides the chamber itself. Suppose that because an auto repair shop replaces a car's defective carburetor with a pineapple, the car will not start. The repair shop's mistake would make the car seriously defective, but it would not cause any physical damage to the car, and so any damages awarded against the shop would not be covered by its GCL policy. *Travelers Ins. Co. v. Eljer Mfg., Inc.*, *supra*, 757 N.E.2d at 813. Not so with respect to damages that the jury awarded Microtherm in the Texas case because of physical damage that the defective water chambers caused to the heaters or to any other property. Tort liability for such consequential damages is limited by the principles of tort causation, but whatever liability the court imposed in a tort suit would, as consequential damages from tortiously inflicted property damage, be within the "because of property damage" coverage of the Comprehensive General Liability policy. The fact that Microtherm's suit against UPG charged misrepresentation rather than negligent damage to property is irrelevant; liability-insurance coverage is based on the facts underlying the liability suit rather than on the cause of action pleaded in that suit. 9 *Couch on Insurance* § 126:3, pp. 126-28 (3d ed., Lee R. Russ & Thomas F. Segalla eds. 2000).

The foregoing analysis requires that we reverse the district court. To begin with, only 65 to 75 out of the 600 heaters that had failed by the time the Texas case went to trial failed during the period in which Ohio Casualty's policy was in force. The business losses resulting from those 65 to 75 failures, out of a total of 3,900 heaters sold—less than 2 percent—are unlikely to have amounted to $25 million, the approximate amount awarded by the Texas jury for business losses resulting from the defective water chamber. Moreover, only about 80 percent of the water-chamber ruptures shorted the circuit board; the other 20 percent just caused the water heater to stop working, and that we know is not property loss.

The deeper problem is that the business losses for which Microtherm sued might well have occurred even if no circuit board had ruptured. From the consumer's standpoint, the precise mechanism that causes his hot-water heater to stop working is irrelevant; all he cares about is that he has no hot water. No doubt if the broken heater leaks and ruins its owner's carpet, there is added fury against Microtherm; but we do not even know how many of the broken heaters caused such damage. The question how much of Microtherm's business losses were due to the rupture of some 52 to 60 failed water chambers that damaged a circuit board (80 percent of the 65 to 70 total failures) was not presented to the jury in Texas because it is an issue related only to insurance coverage, which was not the subject of the Texas case. But not all the business-loss damages awarded in that case could have been due to the 10 percent or fewer ruptures (52-60 out of 600) that both caused damage to property (either the circuit board or the owner's other property, but as we do not know how many of the ruptures caused

damage to the owners' other property we are stuck with our 52-60 estimate) and occurred during the coverage period.

That incremental damage may have been less than 10 percent of the total damages. Suppose that 500 instead of 600 heaters had failed; that would still have been a large fraction of the total sold during the period (3,900), and as word spread, Microtherm's image might become so sullied that the incremental effect on that image, and hence on Microtherm's sales and profits, of another 100 failures would have been slight. If it becomes known that a hotel has bedbugs, *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003), does it matter critically to the hotel's future revenues how many of its rooms were infested? Remember, though, that the 52 to 60 heater failures in which there was property damage within the meaning of the policy occurred early in the period covered by the Texas suit, because Ohio Casualty's policy expired in September 2002 and the earliest failures may have been the ones that did the most damage to Microtherm's business.

But all this is just to say that incremental harm to Microtherm's business caused by the handful of heater failures the liability for which might be within the coverage of the policy was a key issue that the district judge should have tried, rather than supposing it to have been resolved by the Texas jury. Cf. Laurie Vasichek, "Liability Coverage for 'Damages Because of Property Damage' Under the Comprehensive General Liability Policy," 68 *Minn. L. Rev.* 795, 819 (1984). The jury did not apportion the business losses incurred by Microtherm between the policy period in which that handful of failures incurred and the subsequent period. Its verdict was based on all

600 water-heater failures, most of which occurred after Ohio Casualty's policy expired.

Ohio Casualty argues that even business losses resulting from physical damage to other property (the circuit boards and the carpets) are not covered because they were not due to an accident. The finding by the Texas jury that UPG's failure to disclose the risk of rupture was "knowing" implies, according to Ohio Casualty, that the ruptures were the consequence of an intentional act rather than of an accident, which is an unintended act. Insurers are reluctant to insure against the intentional infliction of a tortious harm for obvious reasons of moral hazard (the disincentive that being insured removes to engage in the conduct insured against). In *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 227 (3d Cir. 2005), the insured made deliberately false representations aimed at inducing purchasers to pay more for the insured's services than the law authorized it to charge, and the court property held that the harm inflicted on the purchasers by the fraud was not the result of an accident. In *Wood v. Safeco Ins. Co. of America,* 980 S.W.2d 43, 53-54 (Mo. App. 1998), in contrast, the insured represented to prospective buyers of his property that it would not flood. It flooded, the purchaser sued, and the court held that the insured was covered by his CGL policy. Similarly, UPG didn't *want* its water chambers to rupture, or, more to the point, expect them to. Usually when people cut corners, they think they're taking a small risk of causing a harm, not that they are deliberately inflicting a harm. DuPont had suggested a temperature range that it knew to be safe. A customer of DuPont's, like UPG, might decide to go outside the range, which would make its product less safe; but it would be unlikely knowingly to go so far outside the

range as to generate the astronomical failure rate that the water chambers experienced (600 ÷ 3,900 = 15.4%).

But *Wood* was a case of negligent misrepresentation, while in this case the jury found that UPG's misrepresentations were "knowing" and awarded punitive damages, though modest in amount. There is a difference, however, between an intentional act and an intentional harm. The difference is implicit in the key language of the GCL policy, which is not the definition of an "occurrence" as an "accident," since "accident" is not defined, but rather is the exclusion for harms that are "expected or intended from the standpoint of the insured." UPG's "knowing" misrepresentation was consistent with its not expecting any harm—or at least harm of the magnitude that occurred—to result from the misrepresentation. If therefore it did not intend or expect the harm, it did not forfeit coverage. *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 932 (Ill. 1991); *Calvert Ins. Co. v. Western Ins. Co.*, 874 F.2d 396, 399 (7th Cir. 1989) (Illinois law); *Park University Enterprises, Inc. v. American Casualty Co.*, 442 F.3d 1239, 1245-46 (10th Cir. 2006); Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 8.03[b], p. 460 (11th ed. 2002).

What cannot be determined from the jury's verdict is how great a risk UPG thought it was taking. Surely it did not expect 15 percent of the heaters it sold not to work. What did it expect? Consider *Nationwide Ins. Co. v. Board of Trustees of University of Illinois*, 116 F.3d 1154 (7th Cir. 1997). The insured, a college student, set fire to the Astroturf in the college football stadium. The fire caused $600,000 in damages, and naturally the insurance company refused to pay. The insured, however, "testified that it was never his intent for the Astroturf to burn; rather,

he and his colleagues thought that the lighter fluid alone would burn, leaving only a residue of soot on the portions of the Astroturf to which it had been applied—spelling out the letters "F-O-O" which would be visible on television or from the bleachers. In fact, Zavalis [the insured] recalled, he and his friends had tried the same thing on a concrete sidewalk earlier, and had caused no damage (actually, they couldn't get the lighter fluid even to ignite); and to Zavalis, the Astroturf itself felt like concrete, so he thought the results would be equally harmless. Even after the letters "F-O-O" were ablaze on the field (the flames reaching from eight to eighteen inches into the air), the three young men didn't think they had done any damage to the playing surface." *Id.* at 1156-57 (footnote and record reference omitted). Unsurprisingly, the insured lost. When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk. *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990); *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998).

The present case is less extreme, or at least less clear; and we acknowledged in *Nationwide* that "the insured may not 'expect or intend' the damage when the actual result is an injury wholly different in kind from the type he anticipated would occur; and the magnitude of the resulting harm is one factor that can be considered in that assessment." 116 F.3d at 1156 (citations omitted). Suppose UPG thought that 0.1 percent of the heaters would fail; instead 15 percent did. Is the difference in magnitude enough to show that the harm to the customers that occurred was "expected"? That is a jury question, but not a jury question that the Texas jury answered. It is another question for the trier of fact in this case (a judge,

not a jury, since the parties agreed to a bench trial) to determine.

We need to discuss one more issue, though only briefly, and that is Ohio Casualty's entitlement, should it be found liable to UPG on the policy for any of the damages imposed by the Texas court, to an offset by reason of the settlements that UPG made with its other insurers. The district judge rightly denied the offset on the ground that Ohio Casualty had failed to show what if any part of the settlements should be allocated to the period in which the policy it had issued to UPG was in force. Most of the water-chamber ruptures occurred later. We know from *Travelers Ins. Co. v. Eljer Mfg., Inc.*, *supra*, that under Illinois law property damage does not incur when a defective product is installed, but only when it breaks, so defects in the water chambers that did not produce physical damage until after the policy period are not covered by the policy.

The judgment is reversed and the case remanded to the district court for a determination of what if any part of the damages assessed against UPG in the Texas litigation is covered by the insurance policy.

REVERSED AND REMANDED.

A true Copy:

     Teste:

                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*